# Exhibit 43

# Recommendations Regarding the Protection of Client Assets

## Final Report



### The Board
OF THE
INTERNATIONAL ORGANIZATION OF SECURITIES COMMISSIONS

| FR01/14 | JANUARY 2014 |

Table of Contents

|  | Page |
|---|---|
| Introduction | 1 |
| Principles | 3 |
| Glossary | 9 |
| Appendix A – Client Asset Protection Questionnaire Summary | |
| Appendix B – Feedback Statement | |
| Appendix C – Collated Responses to the Client Asset Protection Survey | |

# Introduction

Events in recent years including the Lehman Brothers and MF Global insolvencies have placed client asset protection regimes in the spotlight.  This has happened as a result of investors trying to better understand the potential implications of placing their assets with particular intermediaries and in certain jurisdictions, and as regulators seek to address risks to client assets and how to transfer or return client assets in default, resolution or insolvency scenarios.  These concerns have led some regulators to consider how they might enhance their supervision of intermediaries holding client assets through clarification of the intermediary's and the regulator's roles in protecting client assets.

While client asset protection regimes may vary across jurisdictions, many jurisdictions have rules and regulations governing client assets.  It is first and foremost the intermediary's responsibility to ensure compliance with these rules, including through the development of risk management systems and internal controls to help ensure financial integrity and monitor compliance.  Where the intermediary places client assets with third parties, the intermediary should reconcile its accounts and records with those of the third party.  While the intermediary must comply with the client asset protection regimes, the regulator has a role in supervising the intermediary's compliance with the applicable domestic rules and maintaining a regime that promotes effective safeguarding of client assets.

Two possible scenarios may contribute to regulatory challenges: where a client has, knowingly or unknowingly, waived or modified the degree of protection applicable to client assets or otherwise opted out of the application of the client asset protection regime (where permitted by law); and where an intermediary has placed or deposited assets in a foreign jurisdiction.[1]

To address the former issue, and to provide greater clarity regarding the status of client assets, documentary requirements should apply.  The intermediary should be required to obtain the client's explicit, recorded consent to any waiver or modification to the protection of the client asset regime or to any opting out of the client asset protection regime. Where such a waiver, modification or opt-out is permitted by law, regulatory regimes may also consider requiring a separate document that addresses only the provision of the consent while highlighting the risks to the client of giving such consent.  The consent should be affirmative and explicit and should not be *deemed* or *implied*.  It is important that clients are aware of the possible effects of a waiver or modification of the degree of protection applicable to client assets or opt-out of the application of the client asset protection regime, especially in the context of a default, resolution or insolvency scenario.  In addition, the record evidencing the client's consent could help clarify the status of client assets at a particular point in time and, if necessary, facilitate return of any client assets in a default, resolution or insolvency scenario.

Where an intermediary has placed or deposited assets in a foreign jurisdiction, the regulator may face further challenges in supervising the intermediary's compliance with the applicable domestic rules. Additional challenges may arise if an intermediary holds client assets in a chain of custody through multiple jurisdictions or places assets with an affiliate in the same group or with a third party regulated, in either case, if at all, outside the intermediary's home jurisdiction.  Where the domestic regulatory

---

[1] With respect to an intermediary whose home jurisdiction is an EU member state, references in this report to placing or depositing client assets in a *foreign jurisdiction* should be read as meaning placing or depositing client assets in a jurisdiction outside of the EU.

regime prescribes requirements for client assets placed in foreign jurisdictions, the regulator should consider how to accomplish its supervisory responsibilities.

The Principles below are intended to apply to the particular intermediary performing the relevant services with associated responsibilities. While some intermediaries may perform a full range of services for a client, in other cases, the scope of services provided to a client by a particular intermediary may be limited. In these cases, the responsibilities set forth in the Principles will apply (or not) to different intermediaries based on the specific services each provides to their client and the responsibilities owed to that client in relation to those specific services. It is important to ensure that an intermediary considers and, where applicable, observes each of the Principles in respect of each client.

Moreover, the Principles below are intended to apply to the relationship between an intermediary and its immediate clients. By contrast, the intermediary would not necessarily owe particular duties to the clients of the intermediary's clients.[2]

Additionally, the Principles below are intended to apply to modifications in ownership status that are initiated by or within the knowledge of the intermediary. For example, where an intermediary, by its own actions, modifies the ownership status of any of its immediate clients' assets, the duties listed in the Principles (and, in particular, the responsibilities of Principles 1 and 6) would apply to that relationship. By contrast, where an intermediary's client, without such intermediary's knowledge, itself takes steps that alter the status of any of the client assets deposited with an intermediary, an intermediary would not be required to perform any of the associated responsibilities listed in the Principles in respect of such action.

\* \* \* \* \* \*

Terms defined in the Glossary have the same meanings in these Principles.

---

[2] An intermediary (the *ultimate intermediary*) may have as a client another intermediary (a *client intermediary*, for example, an introducing broker), and the client intermediary may have clients of its own (*ultimate clients*). The ultimate intermediary may be required to treat any assets deposited by the client intermediary as *client assets*. Moreover, assets deposited by the client intermediary on behalf of ultimate clients (perhaps on an omnibus basis) may attract protections that would not apply to the immediate client's proprietary assets. The ultimate intermediary would not (barring applicable domestic or other requirements) owe duties to individual ultimate clients.

## Principles

**Principle 1 – An intermediary should maintain accurate and up-to-date records and accounts of client assets that readily establish the precise nature, amount, location and ownership status of client assets and the clients for whom the client assets are held. The records should also be maintained in such a way that they may be used as an audit trail.**

Means of implementation

1. An intermediary should establish systems and controls for maintaining accurate and up-to-date records of clients' asset holdings including information specifying the amount, location, and ownership status[3] of client assets. The intermediary's records should be maintained in a way that appropriately distinguishes the client assets account of one client of the intermediary from the client assets account of another client of the intermediary and from the assets of the intermediary itself.
2. The intermediary's records should be sufficient to permit an external party (such as a regulator, an external auditor, or an insolvency practitioner) to verify the amount, location, ownership status and identity of assets held.[4] Where client assets are held with a third party, records should also include the location and the terms and conditions on which a third party holds the client assets.
3. The intermediary's systems and controls should provide for reconciliations on a regular basis, consistent with the volume of activity in the accounts, between internal accounts and records in relation to the client assets and those of any third party with whom such client assets are held. In the context of reconciliations between an intermediary and a central securities depository, such reconciliations should take place on a daily basis.
4. The records and accounts should enable an intermediary to, on a daily basis, specify each client's rights and the intermediary's obligations to each client with respect to client assets.
5. In those jurisdictions where clients may waive, consent to the modification of, or otherwise opt out of any aspect of client asset protection, the intermediary should maintain sufficient records as specified in the means of implementation under Principle 6 to clearly demonstrate compliance with Principle 6.
6. Accounts held with a third party for the benefit of clients should be titled in such a way to clearly distinguish assets held for clients from assets held for the intermediary. Where separate accounts at a third party are held for each client of the intermediary, the accounts should be titled in such a way as to clearly distinguish assets held for one client from assets held for any other client or for the intermediary itself.

**Principle 2 – An intermediary should provide a statement to each client on a regular basis detailing the client assets held for or on behalf of such client.**

Means of implementation

---

[3]    An example of ownership status is the existence of liens or other encumbrances that may affect the return of client assets or their value to clients.

[4]    This should be based on information reasonably available to the intermediary.

3

1. The statement the intermediary provides should be a statement of account or other report to clients showing their asset holdings and money balances as of a reasonably recent date.[5]
2. Where, to the extent permitted by law, the client has waived or modified any aspect of the client asset protection regime, or otherwise opted out of the application of the client asset protection regime, the statement should reflect that fact.
3. Where a client has requested a statement from an intermediary in relation to its assets, the intermediary should respond reasonably promptly to the request.

**Principle 3 – An intermediary should maintain appropriate arrangements to safeguard the clients' rights in client assets and minimise the risk of loss and misuse.[6]**

Means of implementation

1. An intermediary should understand the options, if any, for holding client assets and take into account the levels of client asset protection (both pre- and post-default) in addition to any associated risks.
2. An intermediary should also analyse how certain actions or decisions could materially change the status of the client asset and/or complicate return of the client asset (*e.g.*, if the exercise of a right of re-use or enforcement of a pledge results in a different party succeeding to rights in the client asset). An intermediary may build this understanding through in-house analysis as well as through consultation with professional advisors (*i.e.*, law firms or accountancy firms).
3. Where client assets are placed with a third party (whether in the same jurisdiction or in a foreign jurisdiction and whether an unrelated or affiliated party), the intermediary should exercise all due skill, care and diligence in the selection and appointment (where applicable), and periodic review of the third party and of the arrangements for safeguarding the client assets, and should consider:
    (a) The legal requirements or market practices related to the holding of client assets that could adversely affect clients' rights during business as usual and in the event of resolution or insolvency of the intermediary or the third party;
    (b) The financial condition, expertise and market reputation of the third party;
    (c) Protection or lack thereof attendant upon the regulatory status of the third party; and
    (d) The need for diversification and mitigation of risks, where appropriate, by placing client assets with more than one third party.
4. Where an intermediary places client assets with a third party, the intermediary should, to the extent necessary to achieve compliance with applicable domestic requirements, understand the material effects of the contractual provisions governing that arrangement on the clients' rights in respect of such client assets, including how those contractual provisions would operate in the jurisdiction where such assets are held, including in the event of the resolution or insolvency of the intermediary, the third party or both.
5. An intermediary should be aware of the effect of liens and other encumbrances on client assets and take appropriate steps to ensure that any such lien or encumbrance is only granted to the

---

[5] In some jurisdictions, this may be monthly and in others, quarterly or annually.

[6] As noted above, these Principles apply to cases where an intermediary has responsibility for safeguarding client assets as opposed to cases where an intermediary does not have responsibility for safeguarding client assets.

4

extent, if any, permitted by the regulatory regime, including with respect to any requirement for client consent.[7] Each intermediary should consider the best interest of the clients[8] to the extent it has a choice in agreeing to liens or encumbrances.

**Principle 4 – Where an intermediary places or deposits client assets in a foreign jurisdiction, the intermediary should understand and take into account the foreign regime to the extent necessary to achieve compliance with applicable domestic requirements.**

Means of implementation

> To the extent the home regime imposes requirements on an intermediary that places or deposits client assets in a foreign jurisdiction, the intermediary may face challenges in ensuring its compliance with such domestic requirements. Accordingly, the intermediary should have sufficient knowledge of the domestic as well as foreign regimes where it places client assets to the extent necessary to ensure such compliance. This means that the intermediary has the responsibility to understand the client asset protection regimes and arrangements in every jurisdiction (including its home jurisdiction) in which client assets are kept, to the extent necessary to ensure compliance with the domestic requirements.

**Principle 5 – An intermediary should ensure that there is clarity and transparency in the disclosure of the relevant client asset protection regime(s) and arrangements and the consequent risks involved.**

Means of implementation

1. Consistent with the requirements of its home jurisdiction, an intermediary should ensure its agreements with clients contain adequate and appropriate information about the arrangements for client asset protection and the ways in which the intermediary holds or deposits different types of client assets and the attendant risks. These disclosures should (i) be appropriate in light of the relationship between the client asset and the client's rights in the asset and (ii) take account of the fact that the ownership status of the client assets may affect the degree of protection.
2. Where client assets are to be held or placed in a foreign jurisdiction and will be subject to the client asset protection and/or insolvency regimes of that foreign (*i.e.*, not home) jurisdiction, the intermediary should inform the clients of that fact. The intermediary should, in advance, clearly and in an understandable manner, disclose the risks associated with such client asset custody arrangements and that there may be material differences between the home country and foreign jurisdictions protections and the potential consequences of such differences so the client can make an informed decision concerning its investment.

---

[7]   *See* Principle 6.

[8]   The phrase *best interest of the clients* should not be interpreted to suggest the application of a fiduciary standard beyond the extent required by a relevant jurisdiction. In some common law jurisdictions, certain intermediaries may be subject to the duty to act fairly, honestly and in good faith, while not being technically subject to a fiduciary standard of care.

3. Any required disclosure should be in writing and be prepared in clear, plain, concise and understandable language. Legal or financial jargon not commonly understood should be avoided.

**Principle 6 – Where the regulatory regime permits clients to waive or to modify the degree of protection applicable to client assets or otherwise to opt out of the application of the client asset protection regime, such arrangements should be subject to the following safeguards:**

**(a) The arrangement should only take place with the client's explicit, recorded consent.**

**(b) Before such consent is obtained, the intermediary should ensure that the client has been provided with a clear and understandable disclosure of the implications and risks of giving such consent.**

**(c) If such arrangements are limited to particular categories of clients, clear criteria delineating those clients that fall within such categories should be defined.**

Means of implementation

1. If a waiver, modification or opt-out of client asset protection is permitted in a jurisdiction, the regulatory regime of that jurisdiction should define criteria to delineate the qualifications of clients who will be permitted to waive or modify the protection applicable to client assets or otherwise to opt out of the client asset protection regime. Any such criteria should be clear. Such jurisdictions should also consider prohibiting specific classes of clients from waiving or modifying the protection applicable to client assets or from opting out of the client asset protection regime where that class of client is judged unlikely to have the knowledge or ability necessary to assess effectively the risks associated with the waiver, modification or opt-out.
2. Where appropriate, regulatory regimes may consider requiring different levels of disclosure by an intermediary of the consequences of any waiver, modification or opt-out for different types of clients that are commensurate with their respective sophistication and knowledge of financial markets. Regulatory regimes may also consider requiring a separate consent document for certain types of clients.
3. Any (a) waiver or modification of any aspect of the client asset protection regime or (b) any opting out of the client asset protection regime should, in either event be clear and recorded in writing or in a legally equivalent alternative means, and affirmatively executed by the client.[9]
4. The record evidencing the client's consent should be retained by the intermediary and should allow the intermediary to demonstrate clearly what the client agreed to. This record may help clarify the status of client assets at a particular point in time and, if necessary, facilitate the return of any client assets in a default, resolution or insolvency scenario.
5. To ensure informed consent from the client in relation to a waiver or modification of the protection of client assets or to an opt out of the application of the client asset protection regime, the intermediary should ensure, and should maintain records that confirm, that the client has been provided with adequate and appropriate information and, where appropriate, relevant risk disclosures about:

---

[9] The term *recorded* does not prescribe a legal requirement of form. A *record* is any evidence permissible under national law.

   (a) The contractual and/or statutory limits, if any, on different types of client assets in respect of which the waiver, modification or opt-out is agreed and a clear explanation of how the limits are calculated;
   (b) The consequences to the client of such waiver or modification of the protection of client assets or of such opt-out of the application of the client asset protection regime, and the effect on the client's rights of any exercise of such waiver, modification or opt-out by the intermediary in the ordinary course of business or in the event of a third party's or intermediary's insolvency, and the nature and extent of risks associated with each waiver, modification or opt out, and the client's ability to access any investor compensation scheme, where applicable. This should include material risks to the client of having any client assets held in foreign jurisdictions; and
   (c) The client's right to call for redelivery of the assets, where applicable.
6. Where the intermediary has received a request for written confirmation or written acknowledgment from its client regarding whether any waiver or modification of protection applies to the client assets placed with the intermediary by its client, the intermediary should respond promptly to such a request.

**Principle 7 – Regulators should oversee intermediaries' compliance with the applicable domestic requirements to safeguard client assets.**

Means of implementation

1. Regulators should have and use adequate tools to effectively monitor an intermediary's compliance with the domestic client asset protection regime. Such tools may include, among other things, regulatory measures such as:
   (a) Mandatory reports to the regulator from an intermediary, whether sent on a periodic basis or upon the occurrence of specific events, as to the nature, amount, location, value and ownership status of client assets held, the status of the intermediary's compliance with the applicable requirements and any separate client asset protections that apply where client assets are invested;
   (b) Mandatory periodic or occurrence-related reports to the regulator from self-regulatory organizations (where applicable) as to the status of the intermediary's compliance with the applicable requirements;
   (c) Mandatory reports sent to the regulator from independent external auditors, provided at least annually, as to the adequacy of the intermediary's controls in safeguarding client assets;
   (d) Ad-hoc inspection visits to assess the adequacy of the intermediary's controls and risk management in safeguarding client assets; and
   (e) The establishment of *whistle-blowing* programs to provide an additional mechanism for the monitoring of an intermediary's compliance.
2. The regulator should consider using a risk-based, internal controls focused approach to supervise its intermediaries' compliance with the applicable domestic client asset protection requirements. Such a risk-based analysis should focus on intermediaries that pose the greatest regulatory concerns and should, where practicable, consider:

   (a) The value of client assets held by the intermediary (as an indication of the impact the insolvency of the intermediary would have on clients and the market);

7

     (b) The location of the client assets (as an indication of the impact of concentration risk on that particular intermediary or third party);
     (c) The prudential/capital health and liquidity of the intermediary (as an indication of the likelihood of the insolvency of the intermediary); and
     (d) The intermediary's risk profile including the status of its general governance, risk management systems and internal control arrangements, regulatory history and complexity of its business, markets in which it operates and customer profile (as an indication of potential internal compliance risk posed by the intermediary).

3. The factors referred to in 2 above may also influence the depth of the analysis the regulator conducts with respect to a particular intermediary.
4. Where a jurisdiction requires intermediaries to meet specific qualifications in order to be considered eligible to place or deposit client assets in foreign jurisdictions, the regulatory regime should define clear criteria to delineate those qualifications.

**Principle 8 – Where an intermediary places or deposits client assets in a foreign jurisdiction, the regulator should, to the extent necessary to perform its supervisory responsibilities concerning applicable domestic requirements, consider information sources that may be available to it, including information provided to it by the intermediaries it regulates and/or assistance from local regulators in the foreign jurisdiction.**

Means of implementation

1. To the extent necessary to perform their supervisory responsibilities concerning applicable domestic requirements, regulators should use available information sources in performing those responsibilities with respect to intermediaries placing or depositing client assets in foreign jurisdictions.
2. Intermediaries
       (a) Where the regulator has the power to require this, it may obtain from an intermediary information on the operation of the client asset regime in the foreign jurisdiction (or, where relevant, jurisdictions) where the intermediary places or deposits client assets, and may require such intermediary to demonstrate that it has complied with any applicable client communication requirements.
       (b) Where a regulator has the power to request information regarding the nature, amount, location, value and ownership status of client assets, it should request such information from regulated intermediaries to the extent necessary to perform its supervisory responsibilities.
3. Cooperation with other regulators
       (a) Regulators should endeavour to respond to requests from foreign regulators regarding their client asset protection regime and/or insolvency regime, as far as the request falls within their remit. The local regulator may be in a better position to outline the standards in its jurisdiction and to explain how the client asset protection regime works generally as well as in default scenarios.
       (b) Regulators should consider seeking assistance from the local regulator to obtain information concerning how the foreign client asset protection regime operates. The local regulator may have access to better information and records than the home regulator and in some cases, may be able to verify the location of client assets (*e.g.*, where

8

      permitted by applicable law or regulation, by cross-checking records or through on-site inspections).

(c) Regulators should also consider whether there are adequate mechanisms in place to promote information sharing between jurisdictions whether through pre-existing workstreams (*e.g.*, the IOSCO survey on client asset protection regimes) or in response to ad hoc requests from individual regulators. In particular, regulators should consider whether existing memoranda of understanding (MOUs) are sufficient to provide for information sharing or whether further MOUs or side letters are required.

(d) Regulators should consider any confidentiality and/or data protection issues that may prevent information sharing (especially in a cross-border context). Regulators should consider whether existing MOUs (including side letters) cover, or new memoranda of understanding should be agreed to address confidentiality or other concerns.

(e) To the extent consistent with any confidentiality and/or data protection rules, the regulator should be able to share information with respect to a particular intermediary or particular client asset as necessary. This could include, where permitted by applicable law or regulation, verifying the existence of particular assets or the holdings of a particular intermediary if necessary (*e.g.*, through an on-site inspection or by cross-checking records) and/or sharing information about the intermediary's risk management processes, internal controls, risk profile and record of compliance with client asset protection rules.

# Glossary

**client asset protection regime** – the statutes, regulations, rules or other legally binding requirements of a jurisdiction (including, where applicable, of a self-regulatory organisation) in relation to protection of client assets and any associated rights.

**client assets** – assets (or an analogous term) in respect of which the intermediary has an obligation (either contractual or regulatory) to safeguard for its securities or derivatives clients, including, to the extent appropriate, client positions, client securities and money (including margin money) held by an intermediary for or on behalf of a client.

**client positions** – contractual rights arising from transactions entered into by an intermediary on behalf of its clients, including mark to market accruals arising from the change in value of futures and options positions.

**client securities** – securities, bonds, notes, shares and other similar instruments held for or on behalf of a client, including fully paid securities and margin securities.

**fully paid securities** – securities for which a client has fully paid, and which are free from further pledges and encumbrances.

**intermediary** – a securities firm (including a derivatives firm) that is subject to supervision by a regulatory authority.

**margin securities** – securities purchased in part with money a client has borrowed from the intermediary.

**regulators** – regulatory authority responsible for the supervision of intermediaries' compliance with the applicable client asset protection regime including, where applicable, self-regulatory organisations acting in a supervisory capacity.

**third party** – a party with whom client assets are placed by the intermediary (such as a bank, central counterparty or other entity) including related or affiliated parties to the intermediary.

9