## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.: 19-cv-01785; 19-cv-
01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-
01895; 19-cv-01904; 19-cv-01869; 19-cv-01922; 19-cv-
01870; 19-cv-01791; 19-cv-01792; 19-cv-01926; 19-cv-
01868; 19-cv-01929; 19-cv-01806; 19-cv-01906; 19-cv-
01808; 18-cv-04833; 19-cv-01898; 19-cv-01898; 19-cv-
01812; 19-cv-01896; 19-cv-01815; 19-cv-01924; 19-cv-
10713; 19-cv-01866; 19-cv-01794; 19-cv-01865; 19-cv-
01798; 19-cv-01800; 19-cv-01788; 19-cv-01928; 19-cv-
01803; 19-cv-01801; 19-cv-01894; 19-cv-01810; 19-cv-
01809; 19-cv-01871; 19-cv-01813; 19-cv-01930; 19-cv-
01818; 19-cv-01931; 19-cv-01918; 19-cv-01873

MASTER DOCKET

18-md-02865 (LAK)

## DEFENDANTS' SECOND PROFFER ON ADVICE-OF-COUNSEL EVIDENCE

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ...................................................................................................................3

ARGUMENT .........................................................................................................................6

    A.    The Use of Separate Emails (PX1267) ...................................................................7

    B.    Payments to Ganymede (DX6030), (DX3329)........................................................8

    C.    The 95/5 Partnership Split (DX3345), (DX6028)....................................................9

    D.    Plan Names (DX3247) ...........................................................................................10

    E.    Reporting Requirements (DX3242), (DX3264) ....................................................12

    F.    The Stock Lending Agreement (DX3253)..............................................................13

    G.    Advice That The Transactions Work (PX59), (PX62) ...........................................13

    H.    Discussion of Ezra Transaction with Kaye Scholer (DX3180), (DX3181)...........14

    I.    The Freshfields Brochure (DX5887) .....................................................................15

    J.    Danish Legal Advice Regarding Concentration Limits (DX4140) .......................15

Conclusion ...........................................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Culley v. Edwards Manufacturing Co.*,
    2024 WL 5145565 (S.D.N.Y. Dec. 17, 2024) ...................................................................11

*Eng v. Scully*,
    146 F.R.D. 74 (S.D.N.Y. 1993) .......................................................................................15

*Howard v. SEC*,
    376 F.3d 1136 (D.C. Cir. 2004) ........................................................................................8

*Luce v. United States*,
    469 U.S. 38 (1984) ............................................................................................................6

*United States. v. Greenspan*,
    923 F.3d 138 (3d Cir. 2019) ..............................................................................................6

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ............................................................................................6

*United States v. Bilzerian*,
    926 F.3d 1285 (2d Cir. 1991) ...................................................................................7, 9, 10

*United States v. Novis*,
    No. 20-cr-335, 2023 WL 4746541 (E.D.N.Y., Jul. 24, 2023) ...........................................6

*Unites States v. Scully*,
    877 F.3d 464 (2d Cir. 2017)..........................................................................................2, 6

## STATUTES, RULES, AND REGULATIONS

Fed. R. Evid. 401 .......................................................................................................................11

## PRELIMINARY STATEMENT

To prove its fraud and negligence theories, SKAT must convince the jury that Defendants knew or should have known that Sanjay Shah was not actually obtaining in the marketplace the shares of Danish securities that appeared in the account statements and trade confirms Defendants received. But SKAT has no direct evidence to support this theory: No witness will so testify, no document shows this information was communicated to the Defendants, and SKAT's expert admitted on cross examination that the documents available to the Defendants did not reveal what Shah was really up to. Tr. 644:9-646:4. Indeed, SKAT's expert admitted that Defendants were "two steps removed" from the transactions that revealed Shah's fraud. Tr. 637:24-638:1.

To repair that glaring hole in its case, SKAT—over the defense's objection—has pursued a "fraud in the air" theory, in which SKAT attempts to brand essentially everything the Defendants did as "without a business purpose" or "suspicious" and asks the jury to leap from this other conduct to the inference that the defendants must have known what Shah was doing.

To address that theory, Defendants are entitled to show that they acted like reasonable businesspeople throughout—including by getting legal advice at every step of the transaction. And they are particularly entitled to show that some of the very things that SKAT claims are badges of fraud were in fact vetted by (or in some cases recommended by) counsel.

For example:

- SKAT's expert suggested that the practice of sending trading instructions via separate emails for each plan, rather than a single instruction for all plans, lacked any business purpose. But in fact, counsel specifically recommended this practice, and compliance with counsel's recommendation is of course a reasonable business purpose in itself. Basic fairness requires permitting the defense to introduce this evidence.

1

- SKAT has persistently suggested an intent to hide and conceal.  But Defendants in fact sought advice from counsel—before engaging in any of the transactions at issue—about whether the transactions would trigger various disclosure obligations under U.S. law.  When told that regular disclosures would be required, Defendants elected to go ahead with the transactions anyway and made all required disclosures.  This is affirmative evidence of a good faith intent to comply with the law that Defendants are entitled to present. *See Unites States v. Scully*, 877 F.3d 464, 475 (2d Cir. 2017) ("[The defendant's] defense was that he relied on the advice of counsel in operating his business and therefore lacked the requisite fraudulent intent that the government had to prove at trial.").

- SKAT has suggested that following Solo's direction to make certain fee payments to an offshore entity—Ganymede—was incriminating.  Defendants are entitled to show that they consulted with counsel before making that payment—including disclosing to counsel the purpose of the payment in the context of the transactions—and were advised that it raised no compliance issues.  This is direct evidence of care and diligence, and there is no fair basis to exclude it.

- SKAT has implied that the 95-5 split on the "friends and family plans" is inherently suspicious, and inconsistent with the friends and family being the beneficial owners of the shares.  But Defendants received specific legal advice on this question as well.

We anticipate that much of the evidence of this advice of counsel will be elicited during the testimony of Mr. Markowitz.  To assist the Court in addressing any objections that SKAT may raise to this evidence, we set forth below a proffer of the evidence we expect to elicit, the specific arguments to which it responds, and the legal bases for introduction of the evidence.

## BACKGROUND

On August 15, 2024, SKAT moved *in limine* to "preclude Defendants from arguing at trial that they relied on the advice of counsel in representing to SKAT that the pension plans were beneficial owners of Danish shares and dividends because [Defendants] never received any such advice on which they could have relied."  ECF No. 1132 at 4-5 (quoting Plaintiff's motion *in limine*).  SKAT also moved to preclude "any evidence or argument of any law firm's involvement in activities antecedent to or in furtherance of the representations defendants made to SKAT on the ground that any such involvement would be irrelevant to Defendants' scienter with respect to those misrepresentations and would be unfairly prejudicial to SKAT."  *Id.* at 5.

On September 3, 2024, Defendants opposed SKAT's motion by, *inter alia*, noting that "[t]he lengths to which Defendants went to hire attorneys to ensure that the pension plans were properly qualified, confirm that the plans satisfied the requirements of the tax treaty between the United States and Denmark, make certain the trade strategy adhered to relevant U.S. and foreign securities laws, and involve lawyers in the execution of the strategy are all evidence of Defendants' lack of intent to defraud SKAT."  ECF No. 1161 at 3-4.

On order of the Court, Defendants filed a more than 2,300-page offer of proof that laid out in detail the evidence and argument they sought to introduce.  ECF No. 1202, 1204.  That offer of proof amply documented that Defendants shared every material detail they knew about the transactions with Kaye Scholer, which then provided advice "on matters ranging from the structure of U.S. pension funds and the partnership agreements entered into by those plans, compliance with U.S. tax, pension, and securities regulatory regimes, as well as review and advice on the voluminous contractual agreements between the trading plans and the various third-party brokers, custodians, and advisors who played a role in executing the strategy."  ECF No. 1204 at 12, 13-19; *see also* Tr. 754:21 ("We relied heavily on the lawyers"); ECF 1204-106 (Ben-Jacob Dep.

3

26:19-28:4).    For example, Defendants repeatedly shared with Kaye Scholer diagrams and documents detailing the trading mechanism, Ex. 1 (DX3180) (Mr. Markowitz sent Kaye Scholer "a diagram for the major aspects of the [Ezra] transaction"); Ex. 2 (DX3181) (Mr. Markowitz sent Kaye Scholer a document that ha[d] been prepared by ... Solo Capital ... giv[ing] the details for one of the trades, including the fact that the positions are fully hedged and that they are unwound for the same settlement day."), requested that third parties include Kaye Scholer on email threads, Ex. 3 (DX3222) (Mr. Markowitz forwarded an e-mail from Duet containing questions relating to the Belgian trades to Mr. Ben-Jacob, and requested that Duet "please include" Kaye Scholer "on emails to us"), and involved their attorneys in forming the legal entities necessary for the transactions, Tr. 814:12-14 (Q: You had attorneys at Kaye Scholer help set up the plans, do the formation documents, correct?  A:  And a pension plan consultant that helped us as well.); ECF 1204-106 (Ben-Jacob Dep. 192:2-193:3, 201:1-17) (Kaye Scholer signed Ben-Jacob's name to the beneficial ownership declaration forms submitted to the reclaim agents).  Kaye Scholer also published multiple detailed memos revealing their understanding of the structure and purpose of the transactions, Ex. 4 (DX 3956) (Kaye Scholer memorandum discussing transactions relating to "the Michelle structure," which partly "outlines [Kaye Scholer's] understanding from discussions with [Defendants] of the facts and set-up of the Michelle Structure and the organization of the associated structure as well as the trading activity and related operations of the structure"), Ex. 5 (PX1249) (Kaye Scholer memorandum discussing transactions relating "to the Delvian structure," which partly "outlines [Kaye Scholer's] understanding from discussions with [Defendants] of the facts and set-up of the Delvian Structure and the organization of the associated structures as well as the trading activity and related operations of the structure").  Beyond memos, Kaye Scholer drafted agreements and fielded questions relating to the transactions that revealed their

4

understanding of the trade structures. *See* Ex. 6 (DX3187) (Mr. Ben-Jacob noting that Kaye Scholer was drafting several contracts and agreements relating to the Ezra transaction, including an agreement between Ezra Academy and Solo); Ex. 7 (DX3272) (Mr. Ben-Jacob communicating with Sanjay Shah regarding questions presented by the German government for Ezra Academy).

In response, SKAT objected to four categories of evidence. Relevant here, one objection was to evidence that attorneys at Kaye Scholer were involved in administering and providing U.S. law advice concerning Defendants' dividend arbitrage transactions. ECF No. 1215.

On November 6, 2024, the Court granted in part and denied in part SKAT's motion. With respect to Kaye Scholer, the Court noted that SKAT did not "seek to preclude all evidence of Kaye Scholer's participation," but rather argument that "this participation is relevant to [Defendants'] purported good faith in representing to SKAT that they were the beneficial owners under Danish law of certain securities." ECF No. 1232 at 21. At the time of the filing and based on the record before it, the Court found Kaye Scholer's advice regarding U.S. law had "minimal, if any, probative value." *Id.* That said, the Court held that while Defendants "may not argue that Kaye Scholer's involvement in and advice concerning their scheme evidences their good faith in making the beneficial ownership representations to SKAT," Defendants may "introduce such evidence insofar as they seek to illustrate the mechanics of the trading strategy and show the jury that they did not act alone in filing their claims with SKAT." ECF No. 1132 at 22 (cleaned up).

At trial, SKAT has not limited itself to attempting to prove directly that Defendants knew Solo had failed to obtain shares. Instead, SKAT has attempted to prove its case by attacking a wide variety of actions by the defendants far removed from the beneficial ownership representation to SKAT. As is explained below, that choice has made Kaye Scholer's "involvement in and advice concerning" these other actions highly relevant and probative of the Defendants' state of mind.

And there is no risk of unfair prejudice:  there is nothing remotely unfair in pointing out that counsel advised Defendants on the very actions alleged to be suspicious.  *Luce v. United States*, 469 U.S. 38, 41-42 (1984) (noting that a motion *in limine* ruling "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [] proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling").

## ARGUMENT

Evidence regarding advice provided by counsel, "if believed, can raise [doubt] in the minds of the jurors about whether [it has been proven] that the defendant had an 'unlawful intent.'" *Scully*, 877 F.3d at 476 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989)).  Evidence that Defendants sought review by counsel of an agreement at issue in the case by itself raises factual questions about a defendant's intent that are for the jury to determine at trial. *United States v. Novis*, No. 20-cr-335, 2023 WL 4746541, at *12 (E.D.N.Y., Jul. 24, 2023).  *See also United States. v. Greenspan*, 923 F.3d 138, 149 (3d Cir. 2019) (defendant's testimony that attorney reviewed documents sufficed to require jury instruction on advice of counsel defense). Given the tack SKAT has taken in this case, the jury should be permitted, as it assesses the question of scienter and negligence, to evaluate the evidence reflecting legal advice and the presence of counsel on issues SKAT has specifically called out as indicative of fraud.

### A.    The Use of Separate Emails (PX1267)

SKAT has pointed to the use of separate emails by the Plans in conducting trading as an indicator of fraud. For example, Mr. Dubinsky testified as to the following:

> Q. Any business reason why there had to be 34 emails and not one single email just copying all 34 or listing all 34?
>
> A. **No. There would be no reason.** We saw one spreadsheet that listed all the plans and all the purported trades. There would be no reason that I could think of why you couldn't do this in one email. It's all going to one broker. Obviously – let me just look at PX 8. It's all going to one stock lender. There were two different forward counterparties purportedly, so you would need separate emails at least to break out that. But for the ones going to the same broker for the purchase of the stock, you could have one email. **There would be no reason that I could think of for 34 different emails.**

Tr. 558:1-14. SKAT also confronted Mr. Markowitz in its examination as to his use of these emails for trading. Tr. 848:22-24 (Q: And they were instructed, as we saw the other day, at 7 a.m. on the trading, you shoot out 34 emails, right? A. That's correct.).

Defendants received advice from Kaye Scholer on this precise point, and such advice is direct evidence of Defendants' intent in following this particular procedure. *See, e.g.*, *United States v. Bilzerian*, 926 F.3d 1285, 1292 (2d Cir. 1991) (noting that conversations with counsel as to the legality of certain actions are evidence of knowledge and intent). On January 11, 2013, Peter Wells sent an email to Adam LaRosa and Michael Ben-Jacob following up on a call held the day before. In that email, Mr. Wells said, "[w]e agree that it is probably a good idea to employ the separate email approach as it relates to the instructions that you issue on behalf of the various pension plans." Ex. 8 (PX1267, at -7727). That email chain was thereafter forwarded to Mr. Markowitz.

On cross of Mr. Dubinsky, in response to this testimony, Defendants attempted to elicit the fact that they received legal advice on precisely this question of separate emails; SKAT's objection on that line of question was sustained after a colloquy at sidebar. Tr. 607:2-610:21. The Court

acknowledged, however, that this document "might very well be admissible when your client is on the stand." Tr. 609:9-10. That time has come. Mr. Markowitz is on the stand and must be permitted to explain *why* he and his partners split out communications with brokers and custodians over 34 separate emails. *See, e.g.*, *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) (noting that reliance on the advice of counsel is "evidence of good faith, a relevant consideration in evaluating a defendant's scienter"). Permitting this inquiry also falls within the scope of the Court's previous ruling that Defendants may introduce communications with counsel that relate to the mechanics of the trading strategy. ECF No. 1132 at 22.

### B.    Payments to Ganymede (DX6030), (DX3329)

SKAT cross-examined Mr. Markowitz on Sanjay Shah's instruction that Solo's share of trading profits be paid to Ganymede, an offshore entity Shah controlled. SKAT's questioning emphasized that Ganymede was located in the Cayman Islands, Tr. 771:2-3; that Mr. Markowitz conducted no diligence into Ganymede, Tr. 771:10-15; that he'd never heard of Ganymede before Mr. Shah asked him to start paying that entity, Tr. 771:6-9; that the tax reclaim services agreements between Ganymede Cayman Ltd. and the various pension plans did not define the services Ganymede provided in any detail, Tr. 772:20-774:15, and that although  fees were paid to Ganymede, it was other Solo Capital  affiliated entities that provided the relevant custodial services. Tr. 867:21-868:8.

But none of that was hidden from Kaye Scholer. In fact, promptly upon receiving an email from Solo requesting that payment be sent to Ganymede (described by Solo in the email chain as "our Cayman entity"), Argre partner Matt Stein forwarded the proposal to Kaye Scholder for review, copying Mr. Markowitz. Ex. 9 (DX6030). Kaye Scholer, which had been consulted on every step of the transactions, well understood the issues, including the affiliation between Ganymede and Solo. Kaye Scholer partner Michael Ben-Jacob replied by email on October 18,

2012 that the firm had "reviewed the tax and compliance issues surrounding the payment due to Ganymede" and "see no reason you should not make the payment," assuming appropriate Patriot Act certifications were provided (and they were). Ex. 10 (DX3329). That evidence directly responds to SKAT's attack. From this evidence, a jury could properly infer that Defendants sought and obtained appropriate advice about the propriety of making what SKAT now says was a suspicious payment. Having chosen to make that allegation, SKAT cannot complain that it is somehow unfair or irrelevant for the defense to show they relied on fully informed counsel in making the challenged payment. *See Bilzerian*, 926 F.2d at 1292.[1]

### C.      The 95/5 Partnership Split (DX3345), (DX6028)

SKAT has elicited testimony and introduced evidence showing that certain of the friends and family plans entered partnership agreements that left those plans with a 5 percent interest in any profits earned by those plans. *See, e.g.*, Lerner Designation & Exhibits:  P. Lerner Dep. Tr. 127:19-130:12; PX62 (August 2014 General Partnership Agreement of Loggerhead Services General Partnership); Tr. 713:5-714:5 (SKAT's examination of Mr. Markowitz). Mr. Dubinsky similarly testified regarding this split. Tr. 594:14-25. And in opening SKAT zoomed in on this issue, showing a slide pointing out that after accounting for Solo's share, the friends and family were left with barely 1% of the profits.

This argument invited the jury to conclude that the third-party plans were not beneficial owners of the dividends. But in fact Defendants sought legal advice on this very point, and were assured that the third party plans could lawfully represent that they were. On November 19, 2012, Peter Wells sent Mr. Markowitz an email, cc-ing Jerome Lhote, John van Merkensteijn, Matthew Stein, and Michael Ben-Jacob, summarizing an earlier call. In that email, Mr. Wells explains that

---

[1] Defendants raised this issue following the court session on Thursday.  Tr. 1038-1044.

Kaye Scholer was looking into the "issue" of "the lowest percentage that the Pension Plan can contribute to the general partnership so that the partnership is respected for regulatory purposes" and "whether the Pension Plan can represent that *it is the beneficial owner* of the tax reclaims given the general partnership structure." (emphasis added). And to help with that and related analyses, Mr. Wells requested to see the "specific reclaim forms" at issue. He then said Kaye Scholer would "draft the general partnership agreement based on the determination as to the ultimate financial arrangement between the partners," taking into account the answer on the prior question. Ex. 11 (DX3345 at 2). Kaye Scholer received the requested information, Ex. 12 (DX6028), confirmed that it remained comfortable with the 95/5 split, and accordingly drafted the partnership agreements reflecting that split. That goes directly to Mr. Markowitz's and Mr. van Merkensteijn's mental state and tends to rebut the suggestion that the split was improper or an indicator of fraud. *See Bilzerian*, 926 F.3d at 1292 ("His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.").

### D.    Plan Names (DX3247)

SKAT has suggested that the names chosen for the various LLCs and their sponsored plans are evidence of fraudulent intent, citing an email chain in which Mr. van Merkensteijn and Mr. Markowitz expressed a preference for variety. *See* Tr. 815:13-818:12 (questioning Mr. Markowitz regarding PX2); s*ee also, e.g.*, Tr. 464:7-24 (Mr. Dubinsky discussing lack of evidence that Headsail Manufacturing conducted manufacturing). Mr. Markowitz testified that those plan names were chosen by lawyers at Kaye Scholer, Tr. 815:17-816:3. He also testified that he and Mr. van Merkensteijn "wanted to have different sounding names" not for any nefarious reason, but "because that keeps the books and records different." Tr. 817:3-818:13. Mr. Weinstein expressed overt disbelief that this could possibly be a valid reason, asking, "[s]o if each name started with a

different letter, but they all said 'consulting services,' you're telling me that it would be have been easier to organize them if you make some of them sound not like consulting, but like manufacturing and industries and technology, that's your testimony?" Tr. 817:13-17.  Mr. Markowitz responded, "[t]hat's based on my experience working with lawyers and other firms, that that actually does make it easier, yes." Tr. 817:18-19.

Mr. Markowitz's communications with counsel support his testimony.  On April 17, 2012, Peter Wells emailed Richard Markowitz and Adam LaRosa a draft email to the Solo Compliance officer, regarding "Pension and Retirement Plan Investments I, LP," that purported to attach due diligence for that generically named pension plan.  But he mistakenly attached a structure charter for John van Merkensteijn rather than Richard Markowitz, even though the Pension and Retirement Plan Investments I "flows up to [Mr. Markowitz's] IRA not [Mr. van Merkensteijn's]." Ex. 13 (DX3247 at 1).  This prior incident—in which the lawyers apparently forgot whose IRA was affiliated with the generically-named "Pension and Retirement Plan Investments I, LP"— well-illustrates the perils of using generic names, and conversely the benefits of using varied and original names.  The incidental fact of counsel's involvement in the prior incident is no basis to exclude it.  As SKAT has suggested the specific plan names used in this case are an indicator of fraud, evidence that provides an alternative explanation for the naming convention chosen is relevant because it goes to a "fact of consequence in determining that action"—whether there was fraud—and such evidence has a "tendency to make [that] fact more or less probable than it would be without the evidence."  *See, e.g.*, *Culley v. Edwards Manufacturing Co.*, 2024 WL 5145565 (S.D.N.Y. Dec. 17, 2024) (quoting Fed. R. Evid. 401).  Defendants should be permitted to place this evidence before the jury.

### E.    Reporting Requirements (DX3242), (DX3264)

SKAT has repeatedly elicited testimony and presented evidence intended to suggest that Defendants sought to hide and conceal their trades.  In addition to emphasizing the use of separate emails and varied LLC names, SKAT has drawn significant attention to Defendants' use of reclaim agents and custodians in a manner intended to suggest secrecy and deception.  *See* Tr. 839:22-844:19; *see also* Tr. 913:11 (Q: So what Mr. Shah is telling you to do now is to reach out to these prime brokers and hide the fact that Solo Capital is involved; correct?).  Defendants should be allowed to demonstrate that in fact they knew the transactions would require significant disclosures, and chose to go forward anyway.

Specifically, the documents will show that Mr. Markowitz asked Mr. Ben-Jacob to confirm the reporting requirements to the United States government as a United States resident trading in securities overseas.  Ex. 14 (DX3242).  Mr. Markowitz had heard that the rules had changed, starting in 2012, after the financial crisis, and wanted to ensure compliance with the law.  Mr. Ben-Jacob explained that Defendants would have to file certain forms with the Internal Revenue Service, the Treasury Department, and the Federal Reserve, disclosing their Solo account balances and the volume of trading.  Ex. 15 (DX3264).  Mr. Markowitz and Mr. van Merkensteijn followed that advice.  The Defendants' willingness to go forward with the transactions, knowing from the beginning that significant disclosure was required, is powerful evidence of good faith.  The defense should therefore be permitted to introduce this evidence.

### F.    The Stock Lending Agreement (DX3253)

SKAT has repeatedly suggested that the absence of due diligence on the financial wherewithal of the stock lending counterparties is incriminating. Tr. 749:17-750:21; 757:8-22; 795:1-796:2; Tr. 881:12-884:2. Mr. Markowitz explained that such financial due diligence was unnecessary, given his understanding that the counterparties were going to rehypothecate the shares to the market to obtain financing, rather than rely on their own balance sheet. *See* Tr. 700:14-21, 750:10-752:2, 805:14-17. But to buttress this testimony, he should also be permitted to demonstrate that legal due diligence was done regarding the stock lending transactions. Indeed, Kaye Scholer carefully reviewed the agreements governing the stock lending relationships. For example, on April 18, 2012, Defendants provided the stock lending agreement with Aquila—one of the stock borrowers that SKAT spent considerable time questioning Mr. Markowitz about—to Michael Ben-Jacob and Peter Wells to review. Ex. 16 (DX3253). Defendants should be permitted to argue that seeking legal review of the agreements is consistent with their good faith belief that the transactions were real. After all, why spend the money to have lawyers make sure that the stock lending agreement appropriately protected one's rights if one knew the transactions were a sham and no resort to legal interpretation of the agreement would ever be necessary.

### G.    Advice That The Transactions Work (PX59), (PX62)

In July 2013, Kaye Scholer attorney Peter Wells, copying Mr. Ben-Jacob, emailed the Argre partners and Adam LaRosa noting that Mr. van Merkensteijn had been discussing with Mr. Ben-Jacob the idea of drafting either a memo or a formal legal opinion summarizing all of Kaye Scholer's advice relating to ex-dividend trades. Ex. 17 (PX59). Mr. Wells provided a draft memo listing multiple topics on which Kaye Scholer had provided advice. The discussion continued for several weeks, culminating in an email in which Mr. Ben-Jacob reaffirmed what he had told Defendants all along: "we still think the transactions work." Ex. 18 (PX 62). This direct

affirmation from Kaye Scholer—which had been briefed throughout on the details of the trading—is inconsistent with SKAT's contention that the transactions were suffused with red flags.

### H.    Discussion of Ezra Transaction with Kaye Scholer (DX3180), (DX3181)

As noted above, Defendants disclosed every pertinent detail of the transactions to Kaye Scholer.  Defendants should be permitted to present the evidence of that disclosure to the jury, both to explain the advice subsequently received, and also to show that defendants believed they had nothing to hide.

In presenting that evidence, Defendants should be permitted to present documents demonstrating that they shared with Kaye Scholer in great detail the anticipated dimensions of the Ezra transaction in 2011.  SKAT has suggested that something unspecified was wrong with that transaction, *see, eg.*, Tr. 903:16- 904:14.   The actual dialogue between Kaye Scholer and defendants confirm that defendants saw nothing to hide.  On March 16, 2011, Mr. Markowitz sent Kaye Scholer a diagram laying out the aspects of the transaction, enumerating the steps of the purchases and sales of shares.  Ex. 1 (DX3180).  The following day, on March 17, 2011, Mr. Markowitz forwarded to Kaye Scholer a document prepared by Solo Capital that provided "the details for one of the trades, including the fact that the positions are fully hedged and that they are unwound for the same settlement day." Ex. 2 (DX3181).  The sharing of these granular details with counsel is inconsistent with the asserted intent to defraud, and the alleged negligence.

### I.    The Freshfields Brochure (DX5887)

Mr. Markowitz will testify about a brochure published by Freshfields in 2012 (Ex. 19 (DX5887)) showing the availability of dividend arbitrage transactions in various other countries; this evidence supports Mr. Markowitz's testimony that the concerns expressed by large institutions about dividend arbitrage strategies related to reputational risk, not the legality of the trading itself. *See Eng v. Scully*, 146 F.R.D. 74, 80 (S.D.N.Y. 1993) (evidence that goes to state of mind, including knowledge, motive, and intent, is admissible).

### J.    Danish Legal Advice Regarding Concentration Limits (DX4140)

On November 24, 2014, Mr. Markowitz emailed Mr. Wells and Mr. Ben-Jacob with questions about Danish securities laws, specifically concerning "the disclosure/reporting requirements for a holder of shares in a public company in Denmark" and the threshold concentration of ownership that would trigger different reporting requirements.  Over the course of the following month, Mr. Markowitz and Kaye Scholer remained in communication regarding Mr. Markowitz's questions, questions that Kaye Scholer discussed with local counsel in Copenhagen.  Ex. 20 (DX4140 at 5).  Based on his discussions with Danish counsel, Mr. Ben-Jacob advised that the plans did not need to file reports with the Danish FSA relating to the 5% ownership threshold.  *Id.* at 5-6.

This evidence shows Defendants' belief that the trades were real – for fake shares cannot lead to disclosure requirements.  And it shows that, consistent with that belief, they took measures to ensure cooperation with relevant reporting requirements and rules, which rebuts the asserted negligence.

## <u>CONCLUSION</u>

Defendants respectfully request that they be permitted to elicit testimony regarding the topics discussed in this memorandum and introduce Exhibits PX1267, DX3329, DX6030, DX3345, DX6028, DX3247, DX3242, DX3264, DX3253, PX59, PX62, DX3180, DX3181, DX5887, and DX4140 into the record for the purposes discussed in this memorandum.

Dated: New York, New York
January 20, 2025

Respectfully submitted,

/s/ *Peter G. Neiman*

Boyd M. Johnson
Peter G. Neiman
Alan E. Schoenfeld
Nelson S. Castaño
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Boyd.Johnson@wilmerhale.com
Peter.Neiman@wilmerhale.com
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

Brittany R. Warren
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennylvania Ave NW
Washington, DC 20037
(202) 663-6772
Brittany.Warren@wilmerhale.com

*Attorneys for Richard Markowitz, Jocelyn
Markowitz, Avanix Management LLC Roth
401(K) Plan, Batavia Capital Pension Plan,
Calypso Investments Pension Plan, Cavus
Systems LLC Roth 401(K) Plan, Hadron
Industries LLC Roth 401(K) Plan, RJM Capital
Pension Plan, RJM Capital Pension Plan
Trust, Routt Capital Pension Plan, Routt
Capital Trust*

/s/ *Sharon L. McCarthy*

Sharon L. McCarthy

17

Kostelanetz LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com

Nicholas S. Bahnsen
Daniel C. Davidson
Kostelanetz LLP
601 New Jersey Avenue, NW
Suite 260
Washington, DC 20001
(202) 875-8000
nbahnsen@kostelanetz.com
ddavidson@kostelanetz.com

*Attorneys for Defendants John van Merkensteijn, III, Elizabeth van Merkensteijn, Azalea Pensión Plan, Basalt Ventures LLC Roth 401(K) Plan, Bernina Pension Plan, Bernina Pension Plan Trust, Michelle Investments Pension Plan, Omineca Pension Plan, Omineca Trust, Remece Investments LLC Pension Plan, Starfish Capital Management LLC Roth 401(K) Plan, Tarvos Pension Plan, Voojo Productions LLC Roth 401(K) Plan, Xiphias LLC Pension Plan*

18

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 20, 2025, the foregoing document was served electronically to all parties of record by the CM/ECF system.

*/s/ Peter G. Neiman*

Peter G. Neiman

January 20, 2025